THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* MICHAEL TOLIVER (Impleaded), Defendant-Appellant.

(No. 54635;

First District—June 2, 1971.

Gerald W. Getty, Public Defender, of Chicago, (Michael Weininger and James J. Doherty, Assistant Public Defenders, of counsel,) for appellant.

Edward V. Hanrahan, State's Attorney, of Chicago, (Robert A. Novelle and Brent F. Carlson, Assistant State's Attorneys, of counsel,) for the People.

Mr. JUSTICE BURMAN delivered the opinion of the court:

The defendant, Michael Toliver, was found guilty of murder and attempt robbery after a trial by jury. He was sentenced to serve 20 to 30 years on the murder conviction and 5 to 8 years on the attempt robbery conviction, the sentences to run concurrently.

On appeal, the defendant contends (1) that the in-court identification by Richard Boyd should have been suppressed because it was the product of an unlawful arrest and detention; (2) that he was deprived of a fair trial when the prosecutor made prejudicial remarks during closing argument; (3) that he should not have been sentenced on both offenses since the murder and the attempt robbery arose out of a single transaction; and (4) that his sentence was excessive.

The facts which gave rise to the charges against the defendant may be stated simply. Two men entered Joe's Place, a tavern on Chicago's southeast side, at approximately 9:45 P.M. on August 4, 1968. One of the men who was later identified as Eli Tetter, approached the bartender, Joe Peloza, Jr. The other approached the bartender's sister, Mary Krisco, demanded money, and pulled out a sawed-off shot gun. Mary Krisco panicked, and she and Joe Peloza, Jr. dropped to the floor behind the bar. Eli Tetter and Joe Peloza, Jr. then exchanged gunshots which resulted in the death of each. After the shooting the man who had approached Mary Krisco ran out of the tavern. Two customers, Richard Boyd and Jack Bebout, as well as Mary Krisco, witnessed the incident.

On August 5, 1968, the defendant was arrested and then identified in a lineup by Richard Boyd. Prior to trial, the defendant moved to suppress the identification evidence on the ground the police did not have probable cause to arrest him on August 6, 1968, and consequently that his

subsequent identification was the result of an unlawful arrest and detention.

At the hearing on the motion to suppress, the defendant testified that he voluntarily went to the police station after he had learned that the police were looking for him. He was questioned, and on cross-examination he stated that he was placed in a lineup and viewed by three persons.

Detective Robert Tyson of the Chicago Police Department testified that on August 5, 1968, he interviewed Mary Krisco and received a description of the second man involved in the attempted robbery and murder. He and Detective Rutherford Wilson then went to the home of Eli Tetter where they learned that Tetter and the defendant had been been close friends. In addition, they obtained a description of the defendant from the Tetters which matched the description of the second man given by Mary Krisco and the description included in the original police report. They then went to the defendant's home and spoke with his father. The next day the defendant came to the police station and identified himself as Michael Toliver. Detective Tyson compared his physical appearance with the description of the second robber and then placed him under arrest. After the defendant denied any participation in the crimes, he was placed in a lineup. Detective Tyson's testimony was corroborated by Detective Wilson.

Richard Boyd, who had had an adequate opportunity to view the second person involved in the attempted robbery and murder, positively identified the defendant both at the lineup and at the hearing on the motion to suppress. Mary Krisco, who did not identify the defendant at the lineup, positively identified him at the hearing on the motion to suppress. Jack Bebout stated that the defendant resembled the second man, but that he could not make a positive identification. The motion to suppress the identifications was denied.

■■ A police officer has probable cause to arrest a person without a warrant when the facts and circumstances within his knowledge and of which he has reasonable and trustworthy information are sufficient in themselves to warrant a man of reasonable caution in believing that an offense has been committed and that the person arrested is guilty thereof. (*People v. Peak*, 29 Ill.2d 343, 194 N.E.2d 322.) The question of whether a police officer had probable cause to arrest a defendant must be judged in the light of the totality of the circumstances presented in a given case. (*People v. McCrimmon*, 37 Ill.2d 40, 224 N.E.2d 822.) Here Detectives Tyson and Wilson at the time of arrest (1) knew that the defendant fitted the description of the second robber, and (2) they knew that the defendant was a close friend of the other man who committed the attempted robbery and murder. Based on the totality of these

facts and circumstances, we must conclude that the officers had probable cause to make the arrest and that the motion to suppress was properly denied.

*People v. Bean,* 121 Ill.App.2d 332, 257 N.E.2d 562. *Davis v. Mississippi,* 394 U.S. 721, and *People v. Albea,* 2 Ill.2d 317, 118 N.E.2d 277, cited by the defendant in support of the proposition that the identification should be suppressed as the fruit of an illegal arrest is inapplicable since we have concluded that the police had probable cause to arrest the defendant.

It is next contended that the defendant was denied a fair trial when the prosecutor in effect told the jury that the defendant had been advised by his attorney to offer a perjured defense. The defendant testified that at 9:00 P.M. on August 4, 1968, he was at Matrice Jones' apartment. At that time he was awakened by his friend, Eli Tetter who had a gun. He had a beer which tasted odd, and afterward he felt funny and lightheaded. The next thing that he remembered was waking up the next morning on the couch of Matrice Jones' apartment. Matrice Jones testified that she saw the defendant drink some beer and that the defendant and Tetter left her apartment at about 9:30 P.M.

The defendant did not deny involvement in the robbery and murder. The theory of the defense was that even though the defendant may have been present physically at the scene of the shooting, he did not have the requisite mental capacity to be guilty because he had been involuntarily drugged by Eli Tetter and because in the drugged state he could not appreciate the criminality of his conduct or conform his conduct to the requirements of law. Counsel for the defendant argued this theory vigorously to the jury and the trial judge gave instructions to the jury relating to this defense.

The defendant points to the following remarks in the prosecutor's closing argument and claims that they were so prejudicial that they deprived him of a fair trial:

> "Now, if I say anything about Mr. Toomin or about his case, I don't want you to take it as a personal attack upon Mr. Toomin because he is a fine attorney, but I will address my comments to his case. Once the State has removed his heavy burden, has proved his case, after putting the man on the scene, why would a defendant not deny that he was on the scene? Why wouldn't Michael Toliver, that man, say he wasn't on the scene? Because you are not going to believe him and you are not going to believe the type witness that he brought in. So what does an average attorney or a below average attorney insist, he was not identified, nobody could see him, but what does a good attorney do or what does a

defendant who has been apprised, who has been advised by a good attorney do? He backs up a little, takes an alternate route. He says, 'I don't know if I was there or not.'"

The defendant argues that "[i]n effect the prosecutor told the jury that the defendant's attorney was clever and knew a denial would not be believed. The attorney therefor concocted a different theory and advised his client to 'back up a little' and testify falsely." We cannot agree that the defendant has properly construed the impact of this part of the closing argument. The prosecutor specifically stated that his remarks were not a personal attack on the defense counsel and that they were directed solely to the facts of the case. We are satisfied that under the facts and circumstances here the argument was a fair comment upon the evidence and that it was not prejudicial to the defendant. (See *People v. Ostrand*, 35 Ill.2d 520, 221 N.E.2d 499, and *People v. Sinclair*, 27 Ill.2d 505, 190 N.E.2d 298.) We must note that although objections were made and sustained to other parts of the final argument, no objection was made to the portion which the defendant now claims was prejudicial.

██ The defendant relies upon *People v. Freedman*, 4 Ill.2d 414, 123 N.E.2d 317, in support of his contention. There a defendant was charged with taking indecent liberties with a three year old girl, a crime which by statutory definition required a specific intent. The prosecutor in summation to the jury argued that the defendant brought out the fact that he had visited a large number of bars before committing the crime only after he had conferred with a clever lawyer who knew that his drunkenness could be a defense to a crime of specific intent. The Supreme Court after noting that numerous objections to this line of argument were overruled and that the evidence presented a close case, stated "Arguments of a prosecutor which charge a defendant's counsel with attempts to free his client by trickery tend to deprive the accused of a fair trial and should not be permitted." (4 Ill.2d at 422, 123 N.E. at 321.) The argument in the case at bar was directed against the credibility of the defendant's testimony and did not imply that defense counsel was using improper or devious procedures to obtain an acquittal.

It is next claimed by the defendant that he should not have been sentenced for committing the offense of murder and for committing the offense of attempt robbery because both of the offenses arose out of a single transaction. He argues in addition that the offense of attempted robbery was an integral and inseparable part of the murder indictment and conviction because in order to prove the commission of the murder under a felony-murder doctrine, it was necessary to prove that he was involved in the commission of a forcible felony other than voluntary manslaughter at the time he or someone for whom he is accountable performed the act

which caused a death. Section 9—1(a)(3) of the Criminal Code of 1961. Ill. Rev. Stat. 1967, ch. 38, par. 9—1(a)(3).

Section 1—7 (m) of the Criminal Code of 1961 (Ill. Rev. Stat. 1967, ch. 38, par. 1—7(m)), provides:

> "When a person shall have been convicted of 2 or more offenses which did not result from the same conduct, either before or after sentence has been pronounced upon him for either, the court in its discretion may order that the term of imprisonment upon any one of the convictions may commence at the expiration of the term of imprisonment upon any other of the offenses."

Conduct is defined in Section 2—4 of the Criminal Code of 1961 (Ill. Rev. Stat. 1967, ch. 38, par. 2—4), as "an act or series of acts, and the accompanying mental state."

The construction of these sections was recently considered in *People v. Stewart*, 45 Ill.2d 310, 259 N.E.2d 24, where the Supreme Court held on the facts of the case that sentences should not have been imposed for both attempted robbery and an associated aggravated battery since both charges arose out of a single transaction. The Court noted, however, that "[n]othing in the record in this case suggests that the acts which constituted the offense of aggravated battery were independently motivated or otherwise separable from the conduct which constituted the offense of attempted robbery." 45 Ill. at 313, 259 N.E.2d at 26.

■■ The State submits that the killing and the attempted robbery were independently motivated and separable acts and that consequently sentencing for both offenses was proper. We agree. The evidence established that the defendant demanded money from Mary Krisco while he was armed with a sawed-off shot gun. The fatal shots were fired by Eli Tetter only after Mary Krisco and Joe Peloza, Jr. sought to prevent the robbery and to protect themselves by dropping to the floor. The firing of weapons represented the commencement of a new, distinct, and separable course of action. This case is distinguishable from the situation in *Stewart* where there was no way to separate the conduct which gave rise to the two offenses.

The situation here is analogous to *People v. Johnson*, 44 Ill.2d 463, 256 N.E.2d 343, where the Supreme Court held that it was proper to sentence a defendant both for the offense of burglary and for the offense of rape. The Court emphasized that "[t]hese are separate and distinct crimes requiring entirely different proof to sustain them. The rape has no necessary connection with the burglary as is evident when we stop to consider that the burglary was complete before the defendants laid a hand on the victim. Had the defendant not embarked on an entirely separate course of conduct in making their sexual assault, the burglary

would have occurred without any rape having been committed." (44 Ill.2d at 475, 256 N.E.2d at 350.) Here, as in *Johnson*, after committing one crime the defendant, or one for whom he was accountable, embarked upon a new and distinct course, and the defendant may be properly punished for both crimes.

The defendant finally contends that his sentence was excessive, and he requests that the minimum sentence of 20 years be reduced to 14 years. It is stressed that the defendant did not shoot Peloza, that he had no prior criminal record and that he was only 25 years old at the time of sentencing. It is also pointed out that three witnesses testified as to his character.

■■ In *People v. Caldwell*, 39 Ill.2d 346, 236 N.E.2d 706, which involved a 50 to 100 year sentence for murder, the Supreme Court stated, 39 Ill.2d at 356, 236 N.E.2d at 712:

> "* * * the authority given reviewing court to reduce sentences imposed by trial judges 'should be applied with considerable caution and circumspection, for the trial judge ordinarily has a superior opportunity in the course of the trial and the hearing in aggravation and mitigation to make a sound determination concerning the punishment to be imposed than do the appellate tribunals' (*People v. Taylor*, 33 Ill.2d 417, 424, 211 N.E.2d 673, 677.)"

We find as did the Court in *Caldwell*, that the penalty imposed was not clearly disproportionate to the crime committed and consequently we will not exercise our power to reduce the sentence.

The judgment of the Circuit Court is affirmed.

Judgment affirmed.

ADESKO, P. J., and DIERINGER, J., concur.